COPY

1  Lisa T. Belenky (CA Bar No. 203225)
   CENTER FOR BIOLOGICAL DIVERSITY
2  351 California Street, Suite 600
   San Francisco, CA 94104
3  Telephone: (415) 436-9682 x 307                    **ORIGINAL**
   Facsimile: (415) 436-9683                           **FILED**          E-filing
4  Email: lbelenky@biologicaldiversity.org
                                                        JUL - 2 2008
5
   Michael Senatore, *application for pro hac vice pending*  RICHARD W. WIEKING
6  CENTER FOR BIOLOGICAL DIVERSITY       CLERK, U.S. DISTRICT COURT
                                          NORTHERN DISTRICT OF CALIFORNIA
7  1601 Connecticut Ave. N.W., Suite 701
   Washington, D.C. 20009-1056
8  Telephone: 202-232-1216
   Facsimile: 202-232-1217
9  Email: msenatore@biologicaldiversity.org

10
   Attorneys for Plaintiffs Center for Biological Diversity and Desert Survivors
11

12
                    UNITED STATES DISTRICT COURT
13
                 NORTHERN DISTRICT OF CALIFORNIA
14
                     SAN FRANCISCO DIVISION                        SI
15

16  CENTER FOR BIOLOGICAL DIVERSITY )  Case No. **CV 08    3176**
17  and DESERT SURVIVORS,          )
                                    )
18          Plaintiffs,            )
                                    )
19      vs.                        )   **COMPLAINT FOR DECLARATORY**
                                    )
20  U.S. BUREAU OF LAND MANAGEMENT, )  **AND INJUNCTIVE RELIEF**
    DIRK KEMPTHORNE, Secretary of the )
21  Interior, DEPARTMENT OF THE ARMY, )
    and Brigadier General Dana J.H. Pittard in his )
22  official capacity as the Commanding General )
    for the Department of the Army's National )
23  Training Center and Fort Irwin.   )
                                    )
24                                  )
            Defendants.             )
25                                  )
                                    )
26                                  )

27

28

   COMPLAINT                                                        1
   Case No.

# I. INTRODUCTION

1. This action is brought by Plaintiffs the Center for Biological Diversity and Desert Survivors to protect the desert tortoise, a threatened species listed under the Endangered Species Act ("ESA"), from avoidable impacts of a translocation effort undertaken by Defendant Department of the Army ("Army"). The translocation of approximately 1,700 desert tortoises was intended to protect these individual tortoises and mitigate the impacts of the expansion of the Army's National Training Center at Fort Irwin in the California desert. As part of the mitigation for the base expansion, the Army also acquired lands previously owned by Catellus within designated critical habitat for the desert tortoise. Unfortunately, new information shows that the impacts of the translocation process itself on tortoises may be far greater than anticipated and, therefore, the impacts of the translocation on desert tortoises must be reanalyzed before any additional translocations occur.

2. New information and the experiences from the first phase of the planned two phases of the translocation reveals that the Army is moving tortoises from high quality habitat on Fort Irwin into far poorer habitat and into areas with significantly higher disease rates and potential for disease transmission than that found in the Fort Irwin desert tortoise population. Further, during the first phase of the translocation biologists found that predation on both translocated tortoises and resident or "host" tortoises was far higher than expected. Because all of these factors may lead to impacts to this imperiled species beyond those previously anticipated, the Army was required to reinitiate consultation with the U.S. Fish and Wildlife Service ("FWS" or the "Service"). Its failure to do so is arbitrary, capricious, and not in accordance with the law.

3. Further, the Army and Defendant the Bureau of Land Management ("BLM") signed a memorandum of understanding transferring management of the mitigation lands associated with the Fort Irwin expansion to the BLM without undertaking any environmental review and without consulting with the FWS. Because the transfer of management authority is an action that "may affect" the desert tortoise and its critical habitat, consultation with FWS is required by regulations implementing the Endangered Species Act ("ESA"). *See* 50 C.F.R. 402.14.

1    Similarly, because the change in management will "significantly affect the human environment,"

2    Defendants were required to undertake environmental review pursuant to the National

3    Environmental Policy Act ("NEPA") before transferring management authority.  42 U.S.C. §

4    4321.  Therefore, the Army and BLM are in violation of the ESA, NEPA, and the Administrative

5    Procedure Act ("APA"), 5 U.S.C. § 551.

6       4.   By this action, Plaintiffs request both declaratory and injunctive relief, enjoining any

7    further translocation of desert tortoises until Defendants comply with all legal requirements.

8                              **II. JURISDICTION AND VENUE**

9       5.   Jurisdiction over this action is conferred by 16 U.S.C. § 1540(c) (actions under the

10   Endangered Species Act ("ESA")); 42 U.S.C. §§ 4321-4370 (the National Environmental Policy

11   Act, "NEPA"); 28 U.S.C. §§ 1331 (federal question), 1346, (United States as defendant), 2201

12   (declaratory judgment), and 2202 (injunctive relief), and 5 U.S.C. §§ 701 through 706 (the

13   Administrative Procedure Act, "APA").

14      6.   On March 17, 2006, Plaintiffs provided Defendants, by facsimile and certified mail, with

15   notice of intent to sue for violations of the ESA related to the translocation of desert tortoises

16   from Fort Irwin, California and the transfer of management authority.  Defendants have not

17   responded to that notice.

18      7.   Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiff

19   Desert Survivors is incorporated and based in Oakland, California and Plaintiff Center for

20   Biological Diversity maintains an office in San Francisco, California.

21      8.   An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

22   For all claims, Plaintiffs have exhausted all of the administrative remedies available to them.

23                          **III.    INTRADISTRICT ASSIGNMENT**

24      9.   This action is properly assigned to the San Francisco Division of this Court because

25   Plaintiff Desert Survivors is based in Oakland and Plaintiff Center for Biological Diversity

26   maintains an office in San Francisco.

27

28

COMPLAINT
Case No.

## IV. PARTIES

10. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, nonprofit organization with its main office in Tucson, Arizona and a regional office in San Francisco, California.  The Center's mission is to protect endangered species and wild places through science, policy, education, and environmental law.  The Center has over 40,000 members, many of whom reside in California.  The Center's members and staff regularly use, and will continue to use the California deserts, including the lands at issue here, for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities.  The Center's members and staff have and continue to research, study, observe, and seek protections for the desert tortoise and other listed and sensitive species in the California deserts.  The Center's members and staff derive scientific, recreational, conservation, and aesthetic benefits from the desert tortoise's existence in the wild.  Defendants' violations of law are contributing to the continued decline of tortoise populations and degradation of habitat used by the tortoise, and these violations harm the Center's and its members' interests in the tortoise and its habitat.  The Center brings this action on behalf of itself and its adversely affected members and staff.

11. Plaintiff DESERT SURVIVORS is a California non-profit corporation centered in Oakland, California. Desert Survivors is a conservation organization with approximately 800 members focused on the protection of desert plants, wildlife and ecosystems. Desert Survivors also engages in a vigorous program of public education about desert lands and their unique character.  Desert Survivors' primary goals are to protect fragile desert lands and to teach visitors to those lands about their value.  Desert Survivors members place a high value on the continuing existence and essential value of desert wildlife and wilderness. Desert Survivors leads educational trips to desert lands. Desert Survivors has led more than 400 such trips to the desert in the last fourteen years, more than half of these to places that are home to the desert tortoise. Desert Survivors members value the desert as a natural ecosystem inhabited by special plants and animals. Desert Survivors will continue to lead trips, including service trips, to the desert areas of California as part of its ongoing program of monitoring desert wilderness. A major goal of these

1   trips is to study desert plants and animals in their natural habitats, and to monitor their condition.

2   The desert tortoise is among the most valuable of these, because of its rarity and because of the

3   fragility of its habitat.  Desert Survivors members value desert wildlife living in its wild and

4   natural condition, and enjoy the inspiration and educational benefits of observing wildlife in this

5   habitat. Desert Survivors members and staff have actively sought to protect the California deserts

6   as a place where threatened and endangered wildlife, including the desert tortoise, may flourish,

7   where their habitat may remain unimpaired by development and excessive human interference.

8   Desert Survivors members and directors derive scientific, recreational, conservation, and

9   aesthetic benefits from the desert tortoise's, and other listed and sensitive species' existence in

10  the wild.  Desert Survivors believes that Defendants' actions will cause the continued decline of

11  desert tortoise and, if these declines continue, Desert Survivors' members interests in the

12  survival and recovery of the species and its habitat will be harmed.  Desert Survivors brings this

13  action on behalf of itself and its adversely affected members and directors.

14      12. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is a

15  federal agency within the Department of Interior charged with the management of public lands

16  and has legal responsibility for ensuring that its actions comply with NEPA, FLPMA, and the

17  ESA.

18      13. Defendant DIRK KEMPTHORNE is the Secretary of the United States Department of

19  the Interior and, among other things, is charged with overseeing the management of public lands

20  by the BLM and its compliance with NEPA, FLPMA, and the ESA.  The Secretary is the federal

21  official in whom the ESA vests final responsibility for providing biological opinions and

22  protecting species listed under the ESA.  The Secretary has delegated responsibility for the

23  administration and implementation of the ESA to the United States Fish and Wildlife Service

24  ("FWS").  The Secretary is further charged with implementing statutes, regulations, and

25  Executive Orders 11644 and 11989 on the lands within his control.  Secretary Kempthorne is

26  sued in his official capacity as Secretary of the Department of the Interior.

27      14. Defendant UNITED STATES DEPARTMENT OF THE ARMY ("Army") owns and

28

COMPLAINT                                                                                            4
Case No.

1  controls the lands at issue in this matter, including the National Training Center and Fort Irwin

2  and the Catellus lands acquired as mitigation for the expansion of the National Training Center

3  and Fort Irwin.

4      15. Defendant Brigadier General Dana J.H. Pittard is the commanding general for the

5  Department of the Army's National Training Center and Fort Irwin.  General Pittard is sued in

6  his official capacity.  (Hereinafter, Defendants the Army and Pittard are collectively referred to

7  as "Army").

8  **LEGAL BACKGROUND**

9  **The Endangered Species Act**

10      16. The ESA is a federal statute designed "to provide a means whereby the ecosystems upon

11  which endangered species and threatened species depend may be conserved, [and] to provide a

12  program for the conservation of such endangered species and threatened species…." ESA § 2(b),

13  16 U.S.C. § 1531(b).

14      17. *Listing of Species.*  The ESA requires the Secretary of the Interior ("the Secretary") to

15  issue regulations listing species as endangered or threatened based on the present or threatened

16  destruction, modification, or curtailment of a species' habitat or range; overutilization for

17  commercial, recreational, scientific, or educational purposes; disease or predation; the

18  inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the

19  species' continued existence.  16 U.S.C. § 1533(a)(1).  An endangered species is one "in danger

20  of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(a).  A

21  threatened species is one that will become endangered if current circumstances continue.  The

22  ESA requires that the Secretary make listing determinations "solely on the basis of the best

23  scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  Only if officially listed

24  does a species receive the full protection of the ESA.  The ultimate goal of the law is to conserve

25  and recover species so that they no longer require the protections of the ESA.  16 U.S.C. §§

26  1531(b), 1532(3).  The Secretary has delegated his authority under the ESA to the FWS for

27  terrestrial species including the desert tortoise.

28

18. *Critical Habitat.*   Concurrently with listing a species as threatened or endangered, the Secretary must also designate the species' "critical habitat." 16 U.S.C. § 1533(b)(2). "Critical habitat" is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations. 16 U.S.C. 1532(5)(A). The ESA requires the Secretary to make critical habitat designations and amendments "on the basis of the best scientific data available." 16 U.S.C. § 1533(b)(2). The ESA defines "conservation" to mean "…the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. §1532(3). This definition of "conservation" is broader than mere survival; it also includes the recovery of species. Id.

19. *Recovery Plans.*   Section 4(f) of the ESA requires the Secretary to "develop and implement plans . . . for the conservation and survival of endangered species and threatened species." 16 U.S.C. §1533(f). Recovery plans must include a description of site-specific management actions that may be necessary to achieve the conservation and survival of the species; objective, measurable criteria which, when met, would result in a determination that the species be removed from the list; and estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal. 16 U.S.C. § 1533(f)(1).

20. *Duty to Conserve.*   Federal agencies have an affirmative duty to promote the conservation (*i.e.*, recovery) of threatened and endangered species. Section 2(c) of the ESA provides that it is "…the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C. §1531(c)(1). Section 7(a)(1) also establishes an affirmative duty to conserve. 16 U.S.C. § 1536(a)(1). The duty to conserve applies equally to the Secretary of Interior and other agencies.

21. *Duty to insure survival and recovery; duty to consult.*   Pursuant to Section 7(a)(2) of the

ESA, all federal agencies must "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species . . . determined . . . to be critical . . ." 16 U.S.C. § 1536(a)(2).  To fulfill this mandate, the acting agency must prepare a biological assessment for the purpose of identifying all endangered or threatened species which are likely to be affected by the action, 16 U.S.C. § 1536(c)(1), and must consult with FWS whenever such actions "may affect" a listed species.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

22. *Biological opinion.*  Consultation under Section 7(a)(2) results in the preparation of a Biological Opinion ("BiOp") by FWS that determines if the proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify a species' critical habitat.  The BiOp must include a summary of the information on which it is based and must adequately detail and assess how the action affects listed species and their critical habitats. 16 U.S.C. § 1536(b)(3).  Additionally, a BiOp that concludes that the agency action is not likely to jeopardize a listed species or destroy or adversely modify its critical habitat must include an Incidental Take Statement which specifies the impact of any incidental taking, provides reasonable and prudent measures necessary to minimize such impacts, and sets forth terms and conditions that must be followed.  16 U.S.C. § 1536(b)(4).  Where an agency action may affect a listed species, the absence of a valid BiOp means that the action agency has not fulfilled its duty to insure through consultation that its actions will neither jeopardize a listed species nor destroy or adversely modify the species' critical habitat.

23. The BiOp must include an evaluation of the "cumulative effects on the listed species." 50 C.F.R. § 402.14(g)(3).  In addition to effects of other federal actions, "cumulative effects" include "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

24. Throughout its analysis, the BiOp must utilize the "best scientific and commercial data

1    available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d). FWS must consider all the relevant

2    factors and articulate a rational connection between the facts and its ultimate conclusion.

3    25. If an action's impact on a species' habitat threatens *either* the recovery or the survival of

4    a species, the BiOp must conclude that the action adversely modifies critical habitat. The ESA

5    defines critical habitat as areas which are "essential to the conservation" of listed species. 16

6    U.S.C. § 1532(5)(A). The ESA's definition of "conservation" includes the recovery of species.

7    *See* 16 U.S.C. § 1532(3).

8    26. *Required re-consultation.* After FWS issues an incidental take statement, an agency is

9    required to reinitiate formal consultation with FWS if "new information reveals effects of the

10   action that may affect listed species or critical habitat in a manner or to an extent not previously

11   considered." 50 C.F.R. § 402.16. Because new information shows that the expansion of Fort

12   Irwin and the associated translocation of desert tortoises to the Catellus lands "may affect" the

13   desert tortoise "to an extent not previously considered", the Army was required to reinitiate

14   consultation with FWS. *See id.*

15   27. *Prohibition against "take."* Section 9 of the ESA and its implementing regulations

16   prohibit any person from "taking" a threatened or endangered species. 16 U.S.C. § 1538(a)(1);

17   50 C.F.R. § 17.31. A "person" includes private parties as well as local, state, and federal

18   agencies. 16 U.S.C. § 1532(13). "Take" is defined broadly under the ESA to include harming,

19   harassing, trapping, capturing, wounding, or killing a protected species either directly or by

20   degrading its habitat sufficiently to impair essential behavior patterns. 16 U.S.C. § 1532(19).

21   The ESA not only bans the acts of parties directly causing a take, but also bans the acts of third

22   parties whose acts bring about the taking.

23   28. One exception to Section 9's take prohibitions is relevant here. A federal agency may

24   take listed species only in accordance with an "Incidental Take Statement." 16 U.S.C. §

25   1536(b)(4). If the terms and conditions of the Incidental Take Statement are followed, the

26   federal agency and any permittee are exempted from Section 9's take prohibitions. 16 U.S.C. §

27   1536(o)(2)**.**

28

29. The Army is violating Section 7(a)(2) of the ESA and its implementing regulations by failing to reinitiate consultation with FWS and by failing to ensure through consultation that the translocation of desert tortoises incident to the expansion of Fort Irwin does not jeopardize the continued existence of this threatened species or destroy or adversely modify designated critical habitat. 16 U.S.C. §§ 1536(a)(2), 1540(g); 50 C.F.R. Part 402. This constitutes a violation of the ESA within the meaning of 16 U.S.C. § 1540(g).

30. The Army and the BLM also violated Section 7(a)(2) by failing to consult with FWS before transferring management authority of the Catellus lands from the Army to the BLM.

**The National Environmental Policy Act**

31. The purpose of the National Environmental Policy Act ("NEPA") is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.  NEPA's fundamental purposes are to guarantee that: (1) agencies take a "hard look" at the environmental consequences of their actions *before* these actions occur by ensuring that the agency carefully considers detailed information concerning significant environmental impacts; and (2) agencies make the relevant information available to the public so that it may also play a role in both the decisionmaking process and the implementation of that decision. *See, e.g.,* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

32. NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ") require that all federal agencies, including the BLM and the Army, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.  An agency may prepare an environmental assessment ("EA") to determine whether the affects of the action require preparation of an EIS. *See* 40 C.F.R. § 1508.9.

33. Environmental review must provide a detailed statement of: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-

1    term productivity; and (5) any irreversible and irretrievable commitments of resources that would

2    be involved in the proposed action should it be implemented.  42 U.S.C. § 4332(2)(C).

3    34. NEPA is intended to insure that agencies make informed choices when federal decisions

4    are likely to have environmental consequences.  To that end, an EIS must "inform decision-

5    makers and the public of the reasonable alternatives which would avoid or minimize adverse

6    impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  NEPA also

7    requires federal agencies to analyze the direct, indirect, and cumulative impacts of the proposed

8    action. 40 C.F.R. §§ 1508.7, 1508.8.  One of the most important aspects of NEPA is that the

9    agency is required to consider the cumulative effects of its actions, which the CEQ regulations

10   describe as:

11            the impact on the environment which results from the incremental impact of the
12            action when added to other past, present, and reasonably foreseeable future
              actions regardless of what agency (Federal or non-Federal) or person undertakes
13            such other actions.  Cumulative impacts can result from individually minor but
              collectively significant actions taking place over a period of time.

14

15   40 C.F.R. § 1508.7.

16   35. When preparing an EIS or EA, an agency must ensure that high quality information is

17   available to the agency and the public before any decision is made or action is taken.  Accurate

18   scientific analysis, expert agency comments, and public scrutiny are essential to implementing

19   NEPA.  40 C.F.R. § 1500.1(b).  The agency is required to identify clearly all of its assumptions,

20   to explain any inconsistencies, to disclose all methodologies used, to rebut all contradictory

21   evidence, to eliminate guesswork, to make explicit reference to sources relied upon for

22   conclusions, and to record in an understandable manner the basis for those conclusions.   40

23   C.F.R. § 1502.24.

24   36. NEPA requires federal agencies to "study, develop, and describe appropriate alternatives

25   to recommended courses of action in any proposal which involves unresolved conflicts

26   concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  The analysis of

27   alternatives is the "heart" of the environmental review process; an EIS or EA must "rigorously

28

explore and objectively evaluate all reasonable alternatives," in order to "provid[e] a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14(a). Alternatives that must be considered include the following:  (1) no action alternative, (2) other reasonable courses of actions, and (3) mitigation measures (not in the proposed alternative).   A "reasonable range" of alternatives must be considered, and this must include consideration of full protection of all the resources involved.  The exclusion of reasonable alternatives from review under NEPA renders the analysis invalid.

37. In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action.  40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

38. The Army and BLM violated NEPA by failing to undertake any environmental review before transferring management authority for the Catellus lands from the Army to BLM.

**The Administrative Procedure Act**

39. The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

40. The Army and BLM are federal agencies subject to the APA.  The transfer of management authority for the Catellus lands from the Army to the BLM was a final agency action subject to judicial review under the APA.  *See* 5 U.S.C. § 704.

41. The APA provides that a court shall set aside agency "findings, conclusions, and actions" that are "arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or are "without observance or procedure required by law." 5 U.S.C. § 706(2)(D).

# FACTUAL BACKGROUND

**The Desert Tortoise**

*Basic Ecology*

42. The desert tortoise is a large, herbivorous reptile occurring in the deserts of California, Arizona, Nevada, Utah, and Sonora and Sinaloa, Mexico.  Ideal habitat includes areas of creosote bush scrub with high perennial plant diversity, high ephemeral plant production, annual precipitation levels of two to eight inches, and soil that will support burrows. In California, the species is most active in spring and early summer when annual plants are available for forage. Although desert tortoises are also active during the warm fall months and sporadically after summer rain storms, they spend most of the remainder of the year in burrows.

43. Desert tortoises are long-lived and do not reach sexual maturity until they are 15 to 20 years old.  Once they reach sexual maturity, females produce only one to three clutches of eggs per year, and most clutches contain three to seven eggs.  Although young desert tortoise survival rate estimates vary, research indicates that, at most, approximately twenty percent survive their first three years of life and only two percent of desert tortoises survive to sexual maturity.

44. While desert tortoises will eat a variety of native plants, climatic factors associated with desert environments often limit food availability.  Because of their diminutive size and high energy requirements, young tortoises require access to small, protein-rich plants like wildflowers.  Relative to young desert tortoises, adults require less protein and may access larger plants, thereby increasing the range of acceptable forage species available to adults.

*Species Status*

45. Due to a precipitous decline in desert tortoise populations throughout the species' range, FWS published an emergency rule listing the desert tortoise as endangered in 1989.  54 Fed. Reg. 32326.  The Mojave Desert distinct population segment ("DPS") of the desert tortoise, including all tortoises in California as well as in parts of Arizona, Nevada and Utah, was listed as "threatened" in 1990.  55 Fed. Reg. 12178.  Critical habitat was designated in 1994.  59 Fed. Reg. 5820.

1    46. Unfortunately the species' plight has only worsened since listing.  Studies show that

2  tortoise populations in the Mojave Desert are facing a near total collapse.  One study plot showed

3  an 84% decline between 1992 and 1999.   In another study, surveys including 1,200 transects

4  over a large area of the Western Mojave Desert failed to detect desert tortoises in areas where

5  desert tortoises were previously considered to be common.  On March 15, 2000, the BLM

6  released the report of a panel of tortoise experts addressing the status of the species in the West

7  Mojave in relation to the proposed expansion of Fort Irwin.  The panel found that "substantially

8  fewer" tortoises occurred than were estimated to occur in 1994 and concluded that "the desert

9  tortoise in the West Mojave Recovery Unit is more appropriately characterized as 'endangered'

10  than 'threatened.'"  [cite?]

11    47. In 2004, the Recovery Plan Assessment Report found that there had been significant

12  population decline in the West Mojave population. "[T]he year effect yielded a significantly

13  negative trend in adult density estimates over time . . . This analysis indicates that, taken

14  together, tortoise densities on the permanent study plots located within the Western Mojave

15  Recovery Unit are declining, as was suggested in the Recovery Plan. . . . This pattern suggests

16  that recovery actions implemented since the Plan have not resulted in the reversal of this

17  declining trend." Desert Tortoise Recovery Plan Assessment Committee Report (2004)

18  ("DTRPAC Report") at 58.  The draft 2004 DTRPAC Report had also recommended that the

19  Western Mojave Recovery Unit of the tortoise should be uplisted to endangered status. Despite

20  listing and designation of critical habitat, tortoise populations have continued to decline at alarming

21  rates.  *See* DTRPAC Report at 61 ("the downward trend in adult tortoise densities in the Western

22  Mojave clearly dominates the analyses").

23    48. Desert tortoises are suffering habitat loss and degradation and increased predation as a

24  result of activities such as urbanization, agricultural development, grazing, off-road vehicle use,

25  military training, recreational use, and mining, and are at risk from diseases and collisions with

26  vehicles.  Artificial water sources in backcountry and wilderness areas also present a threat to

27  desert tortoises directly by entrapment and drowning and indirectly by subsidizing predators.

28

COMPLAINT                                                                                          13
Case No.

1  **Fort Irwin National Training Center Expansion**

2   49. Pursuant to the Fort Irwin Military Lands Withdrawal Act of 2001, over 110,000 acres of

3  land formerly managed by BLM were withdrawn from the public lands, for military use. Due to

4  the base expansion, training and heavy maneuvers will occur on both the withdrawn land in the

5  Superior Valley and approximately 20,000 acres along the southern boundary of Fort Irwin that

6  is currently off-limits to force-on-force training. All told, the expansion will adversely impact

7  over 75,000 acres of desert tortoise critical habitat and is currently estimated to displace

8  approximately 1,700 desert tortoises.

9   50. To mitigate adverse effects of the expansion on desert tortoises, the Army purchased

10 almost 100,000 acres of land formerly owned by Catellus within desert tortoise critical habitat

11 and agreed to translocate as many desert tortoises as possible from areas where training will

12 occur as a result of the Fort Irwin expansion. In June, 2007, the Army awarded a contract worth

13 $6.9 million to I.T.S. Corporation to carry out the translocation of desert tortoise from the

14 expansion areas to host sites within the Catellus lands. The Army also contracted with USGS to

15 carry out a health and disease research program studying a small portion of the translocated

16 tortoises.

17 **FWS Biological Opinions Regarding Fort Irwin Expansion**

18  51. Although the Fish and Wildlife Service initially found that the loss of critical habitat in

19 this area would jeopardize the existence of the desert tortoise, relying on the Army's

20 commitment to undertake various significant mitigating actions, in 2004, FWS issued the

21 "Biological Opinion for the Proposed Addition of Maneuver Training Lands at Fort Irwin

22 California (1-8-03-F-48)" ("2004 Fort Irwin BiOp") finding that the Fort Irwin expansion was

23 unlikely to jeopardize the continued existence of the desert tortoise. In that opinion, FWS

24 specified that "[i]f the Army wishes to pursue any other discretionary actions that may affect the

25 desert tortoise or its critical habitat" beyond those actions associated with training, preparation

26 for training, and translocation of desert tortoises from the proposed new training areas, "it must

27 consult with the [FWS], pursuant to section 7(a)(2) of the [Endangered Species] Act."

28

COMPLAINT                                              14
Case No.

52. The Army contracted with the U.S. Geological Survey ("USGS") to develop a desert tortoise translocation plan, and USGS released the plan in 2005. Among strategies discussed in the plan were the release of translocated tortoises into areas already occupied by desert tortoises, detainment in pens of desert tortoises who are candidates for translocation but who also exhibit symptoms of upper respiratory tract disease, and construction of a desert tortoise-proof fence along I-15 to prevent translocated tortoises from trying to cross the freeway.

53. In the "Biological Opinion for Translocation of Desert Tortoises from the Southern Expansion Area of Fort Irwin to Occupied Habitat, San Bernardino County, California (1-8-05-F-43)" ("2006 Translocation BiOp"), the FWS considered the effects on desert tortoise and desert tortoise critical habitat of this translocation plan for the 20,000 acre area along the southern boundary of Fort Irwin ("Southern Expansion Area"). In that BiOp, FWS stated

> that the proposed translocation of desert tortoises from Fort Irwin to the translocation area, the installation, use, and maintenance of quarantine pens, and the installation and maintenance of a fence along the southbound side of Interstate 15 are not likely to jeopardize the continued existence of the desert tortoise….because the proposed action would likely kill or injure few desert tortoises.

The BiOp also concluded that translocation would not result in adverse modification of desert tortoise critical habitat.

54. Importantly, both BiOps specify that the Army must re-initiate consultation:

> if the amount or extent of taking specified in the incidental take statement is exceeded, or
> if new information reveals effects of the action that may affect the desert tortoise to an extent not previously considered.

55. The translocation, as planned, consists of two phases. First, translocation of tortoises from the southern expansion area and second, the translocation of tortoises from the western expansion area, including the Superior Valley.

56. On March 17, 2008 Plaintiffs provided FWS, the Army, and BLM with sixty days notice of their intent to sue for violations of the ESA and NEPA. Plaintiffs alleged that the Army violated the ESA by failing to re-initiate consultation with FWS in light of new information revealing unanticipated effects of translocation on desert tortoises. Plaintiffs also alleged that the

1    Army and BLM violated the ESA and NEPA by failing to consult with FWS and by failing to

2    perform an environmental review regarding the transfer of management of the Catellus lands

3    from the Army to BLM.

4    **New Information Regarding Likely Impacts from the Translocation**

5    57. Plaintiffs are informed and believe and based thereon allege that new information shows

6    that the impacts of the translocation on the desert tortoise population is likely to be greater than

7    anticipated at the time the BiOps were issued.  For example, results of studies and surveys

8    presented at the 2008 Desert Tortoise Symposium ("the Symposium") show that lower habitat

9    quality and higher disease rates in translocation host sites may frustrate the purposes of

10   translocating tortoises from Fort Irwin to the Catellus lands.

11   58. Plaintiffs are informed and believe and based thereon allege that blood samples collected

12   from desert tortoises before translocation in both the Southern Expansion Area and translocation

13   host sites indicate far lower disease rates in the Southern Expansion Area population relative to

14   the population in the translocation host sites.  Moreover, Plaintiffs are informed and believe and

15   based thereon allege that additional surveys and habitat mapping show desert tortoise habitat in

16   the translocation host sites is substantially inferior to desert tortoise habitat found in the Southern

17   Expansion Area.  Plaintiffs are informed and believe and based thereon allege that research also

18   shows that desert tortoise density is far lower in host sites than in the Southern Expansion area,

19   and this suggests either that disease caused a significant die-off at host sites or that the habitat in

20   the host sites cannot support larger desert tortoise populations.  Because translocation will create

21   higher tortoise densities in lower quality habitat, thus likely creating additional stress and

22   increasing susceptibility to disease, the impacts of disease transmission due to translocation

23   should be re-evaluated.

24   59. It has long been known that roads can cause a significant decrease in tortoise populations.

25   *See, e.g.,* Boarman, W.I., and Sazaki, M, "A highway's road-effect zone for desert tortoises

26   (*Gopherus agassizii*)," Journal of Arid Environments 65(2006) 94-101; Hoff, Karin von

27   Seckendorff, and Marlow, Ronald William, "Impacts of vehicle road traffic on desert tortoise

28

1    populations with consideration of conservation of tortoise habitat in southern Nevada,"

2    Chelonian Conservation and Biology, 2002, 4(2):449-456. Dirt roads and off road vehicle

3    ("ORV") routes that are less frequently traveled can also cause a significant decrease in nearby

4    tortoise populations and in habitat quality. *See, e.g.,* Brooks Matthew L., and Lair, Bridget,

5    "Ecological Effects of Vehicular Routes in a Desert Ecosystem," USGS, 2005; Bury and

6    Luckenbach, "Comparison of Desert Tortoise (*Gopherus agassizii*) Populations in an Unused

7    and Off-Road Vehicle Area in the Mojave Desert," Chelonian Conservation and Biology, 2002,

8    4(2):457-463. In 2008, USGS also presented data at the Symposium showing a significantly

9    higher incidence of disease in desert tortoises found close to roads, thus confirming the results of

10   Berry et al. in "Attributes of desert tortoise populations at the National Training Center, Central

11   Mojave Desert, California, USA," Journal of Arid Environments 67(2006) 165-191, which found

12   that areas of high disturbance (such as roads) correlate positively with areas with high disease

13   rates.

14       60. Given the proximity of the translocation host sites to I-15, the Fort Irwin Road (which is

15   know to have gaps in its tortoise fencing), the Mannix trail used by the Army to move heavy

16   equipment on and off the base, as well as the myriad forms of disturbance created within the host

17   sites by other roads, ORV routes, human habitation, trash, and mining, this new information

18   shows that translocating desert tortoises to the Catellus lands will place tortoises in areas of

19   higher risk for disease than previously expected. Accordingly, the likelihood of disease

20   transmission and its impacts on both the translocated tortoises and the host population must be

21   re-evaluated before the translocation moves forward.

22       61. In addition, a study published in 2007 shows significant divergence between various

23   populations within the listed DPS of the desert tortoise. *See* Murphy, Robert W., Berry, Kristin

24   H., Edwards, Taylor, and McLickie, Ann M., "A Genetic Assessment of the Recovery Units for

25   the Mojave Population of the Desert Tortoise, *Gopherus agassizii*," Chelonian Conservation and

26   Biology 2007, 6(2): 229-251. Although scientists and FWS have in the past recognized some

27   level of distinctness between desert tortoise populations based on habitat use, behavior, and other

28

COMPLAINT                                                                    17
Case No.

factors, this new information provides specific evidence of genetic divergence between these populations.

62. Most importantly, Murphy *et al.* found that tortoise populations in the West Mojave Desert are significantly distinct from other populations, including those in closest proximity, such as the Eastern Mojave, the Northeastern Mojave, and Eastern Colorado populations. They also found that the West Mojave population could be further distinguished into three subgroups. Given the extent of this genetic distinctness, this new information shows that FWS' practice in the BiOps of evaluating impacts to the desert tortoise and its critical habitat on a range-wide basis from the western Mojave desert to the Colorado desert in southern California and east into southern Utah should be re-examined.

63. Taken as a whole, there is significant new information that shows that the potential loss of large numbers of tortoises in the western Mojave due to unanticipated impacts of translocation may result in greater impacts on translocated tortoises than expected such that the translocation efforts may not adequately mitigate impacts to the species from the Fort Irwin expansion. Accordingly, in light of this new information, the Army should have re-initiated consultation with the FWS before undertaking the first phase of the translocation and its failure to do so violated the ESA. The Army's continuing failure to re-initiate consultation before undertaking the second phase of the translocation also violates the ESA and Plaintiffs herein seek an injunction prohibiting any further translocations off the base until such re-consultation is both initiated and completed.

64. Moreover, the failure of either the Army or BLM to consult with the FWS or to complete NEPA review before transfer of land management of the Catellus lands to the BLM violated both the ESA and NEPA. Unless and until NEPA review is completed and ESA consultation is completed, no further translocations should take place.

**Current Status of Desert Tortoise Translocation from Fort Irwin to Catellus Lands**

65. The first phase of translocation was undertaken from early to mid-April of 2008. Plaintiffs are informed and believe and based thereon allege that approximately 550 tortoises

were translocated from Fort Irwin to the Catellus lands.  *See* "Tortoises Airlifted to New Home to Make Room for Fort Irwin Expansion", The Press-Enterprise, April 5, 2008; "Army Moves Ahead With Tortoise Transfer", Desert Dispatch, April 4, 2008.  Biologists reported extremely high predation rates on both desert tortoises who had been translocated and tortoises already in the host areas.  In only the first three weeks after translocation began, 23 translocated and "host" tortoises were killed by coyotes and several others lost limbs and suffered other wounds as a result of predator attacks.  S*ee* "Almost Two Dozen Tortoise Deaths", The San Bernardino County Sun, April 19, 2008.  Plaintiffs are informed and believe and based thereon allege that among the tortoises killed were included one or more female tortoises with fertile eggs.  Because predation rates far exceeded that predicted in the translocation plan, the Army contracted with the United States Department of Agriculture Wildlife Services to implement a coyote removal program. *See id.*  Coyotes and the common raven are well-known predators of desert tortoise.

66. Plaintiffs are informed and believe and based thereon allege that the Army plans to translocate an additional 100 tortoises from the Southern expansion area in the fall of 2008 and that the second phase of the translocation from the Superior Valley may also begin as early as September 2008.

**Transfer of Management Authority of the Catellus lands from the Army to BLM**

67. Although the 2004 Fort Irwin BiOp anticipated that land acquired by the Army to mitigate the effects of the Fort Irwin expansion would ultimately be managed by BLM, it did not evaluate management of these lands by BLM nor did it evaluate how such management would affect the resident desert tortoises, critical habitat, or the transoclated tortoises.   The 2006 Translocation BiOp also failed to analyze management of the Catellus lands by BLM.

68. In 2006, the Army transferred management of the Catellus lands to BLM via a 2 page document entitled "Management of Army Acquired Mitigation Lands by BLM" (011FG-2006-0389 P2) ("management transfer memo").   The transfer of management authority was a final agency action under the APA. 5 U.S.C. § 704.  The management transfer memo states that the lands will be managed by the BLM in conformance with the West Mojave Plan, a BLM resource

management plan that did not include the Catellus lands. Under the MOU, BLM would manage the Catellus lands to allow multiple uses of resources—which includes use by off-road vehicles and other uses that may adversely affect the desert tortoise and its critical habitat on the Catellus lands.

69. The transfer of management authority from the Army to BLM is an action that significantly affects the environment and the failure of either the Army or BLM to complete NEPA review before transfer of land management authority to the BLM violated NEPA.  Unless and until NEPA review is completed, no further translocations should take place.

70. The transfer of management of these lands from the Army to BLM constitutes an action that "may affect [a] listed species or critical habitat" because management of these lands by BLM will affect both the resident and translocated desert tortoise populations found on these lands.  50 C.F.R. § 402.14.  Accordingly, ESA section 7 consultation was required.  Because neither BLM nor the Army consulted with FWS regarding the transfer of management, both agencies violated section 7(a)(2) of the ESA.  *See* 50 C.F.R. § 402.14.

## CLAIMS FOR RELIEF

### First Claim for Relief

### (Against All Defendants for Violations of NEPA)

71. Each and every allegation set forth in this Complaint is incorporated herein by reference as if set forth in full.

72. Based on the above facts and legal obligations, Plaintiffs allege that the Army and BLM failed to fulfill their duties under NEPA by failing to undertake environmental review pursuant to NEPA regarding significant direct, indirect, and cumulative impacts of the transfer of land management authority on desert tortoises and desert tortoise critical habitat, other biological resources that may be significantly impacted by the proposed transfer of ownership, and the other resources in and near the action area before initiating transfer of management of the Catellus lands from the Army to BLM.

73. The Army's and BLM's actions and inactions in this regard are arbitrary, capricious, and

1  not in accordance with procedures required by law, in violation of the APA. 5 U.S.C. §§ 701-06.

2                              **Second Claim for Relief**

3                  **(Against All Defendants for Violations of the ESA)**

4  74. Each and every allegation set forth in this Complaint is incorporated herein by reference

5  as if set forth in full.

6  75. The transfer of management authority from the Army to BLM constituted final agency

7  action subject to judicial review pursuant to the APA. 5 U.S.C. § 704. The Army's and BLM's

8  failure to consult with FWS regarding the transfer of management of the Catellus lands to BLM

9  was arbitrary, capricious, and unlawful because the transfer of management authority is an action

10  that "may affect listed species or critical habitat." 50 C.F.R. § 402.14. No biological opinion

11  exists that clearly identifies and analyzes the impacts of the transfer of management of the

12  translocation host areas from the Army to BLM or provides any take authority for BLM to

13  manage the resident tortoises or the translocated tortoises on these lands. Accordingly, the Army

14  and BLM were required to consult with FWS regarding the transfer of management, to ensure

15  that the transfer of management and management by the BLM does not jeopardize the desert

16  tortoise or other listed species or destroy or adversely modify critical habitat.

17  76. The Army and BLM are in violation of section 7 of the ESA and remain in violation of

18  section 7 of the ESA for failing to ensure against jeopardy and destruction or adverse

19  modification of critical habitat. These violations are subject to judicial review under 16 U.S.C. §

20  1540(g).

21                              **Third Claim for Relief**

22  **(Against Defendants the Army and the Commanding General for Violations of the ESA)**

23  77. Each and every allegation set forth in this Complaint is incorporated herein by reference

24  as if set forth in full.

25  78. Because the new information outlined above reveals "effects of the action that may

26  affect listed species or critical habitat in a manner or to an extent not previously considered," the

27  Army was required to re-initiate consultation pursuant to the ESA's implementing regulations,

28

50 C.F.R. § 402.16, and the terms of the 2004 Fort Irwin BiOp and the 2006 Translocation BiOp. Accordingly, the Army's failure to re-initiate consultation violated its duties under the ESA section 7 to ensure against jeopardy and destruction or adverse modification of critical habitat.

79. The Army violated section 7 of the ESA and remains in violation of section 7 of the ESA for failing to re-initiate consultation regarding the translocation of desert tortoises from Fort Irwin in order to ensure against jeopardy and destruction or adverse modification of critical habitat. These violations are subject to judicial review under 16 U.S.C. § 1540(g).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Adjudge and declare that Defendant the Army's failure to undertake environmental review before initiating the transfer of management of the Catellus lands to BLM violates NEPA.

(2) Adjudge and declare that Defendant BLM's failure to undertake environmental review before initiating the transfer of management of the Catellus lands to BLM violates NEPA.

(3) Adjudge and declare that Defendant the Army's failure to re-initiate consultation with FWS in light of new information that reveals "effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" violates the Endangered Species Act and its implementing regulations.

(4) Adjudge and declare that Defendant the Army's failure to initiate consultation with FWS regarding the transfer of management of the Catellus lands to BLM violates the Endangered Species Act and its implementing regulations.

(5) Adjudge and declare that Defendant BLM's failure to initiate consultation with FWS regarding management of the Catellus lands by BLM violates the Endangered Species Act and its implementing regulations.

(6) Order Defendants the Army and BLM to undertake environmental review of the transfer of management of the Catellus lands to BLM pursuant to NEPA.

(7) Order Defendant the Army to re-initiate consultation with FWS to determine whether

1  in light of the new information the translocation will have greater impacts to desert tortoises or

2  critical habitat than anticipated in the existing biological opinions and incidental take statements.

3  (8) Order Defendants the Army and BLM to consult with FWS regarding the transfer of

4  management of the Catellus lands to BLM.

5  (9) Pending completion of an adequate environmental review for the transfer of

6  management of the Catellus lands from the Army to BLM, enjoin Defendants the Army and the

7  BLM from effectuating the transfer.

8  (10) Pending completion of adequate re-consultation with FWS regarding whether the

9  new information outlined herein and any other new information reveals new "effects of the

10  action that . . . affect listed species or critical habitat in a manner or to an extent not previously

11  considered," and full compliance with Section 7(a)(2) of the ESA, enjoin the Army from

12  undertaking any additional translocation of desert tortoises from Fort Irwin.

13  (11) Pending completion of an adequate biological opinion addressing the transfer of

14  management of the Catellus lands from the Army to BLM, enjoin Defendants BLM and the

15  Army from authorizing any activities that could cause additional take of tortoises on the host

16  lands (including the use of off-road vehicles) and declare null and void and set aside the MOU

17  transferring management of the host lands to the BLM.

18  (12) Award Plaintiffs their fees, costs, expenses and disbursements, including reasonable

19  attorneys' fees as provided by the ESA, 16 U.S.C. § 1540(g)(4), and/or the Equal Access to

20  Justice Act, 28 U.S.C. § 2412; and

21  (13)  Grant Plaintiffs such additional and further relief as the court deems just and

22  proper.

23  DATED: July /, 2008

Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
351 California, Suite 600
San Francisco, CA 94104
Telephone: (415) 436-9682 x 307
Facsimile: (415) 436-9683
Email: lbelenky@biologicaldiversity.org

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael Senatore, *application for pro hac vice pending*
CENTER FOR BIOLOGICAL DIVERSITY
1601 Connecticut Ave. N.W., Suite 701
Washington, D.C. 20009-1056
Telephone: 202-232-1216
Facsimile: 202-232-1217
Email: msenatore@biologicaldiversity.org

Attorneys for Plaintiffs Center for Biological Diversity and Desert Survivors